# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

ESTHER WILLIAMS, Individually,
and as Administrator of the
Estate of PHILLIP WILLIAMS,

    Plaintiff,

    v.

UNITED STATES OF AMERICA,

    Defendant.

CV 5:17-088

## ORDER

Before the Court are Defendant's Motion for Summary Judgment, dkt. no. 61, and Plaintiff's Motion to Strike, dkt. no. 78. The Motions have been fully briefed and are ripe for review. For the reasons provided below, Defendant's Motion for Summary Judgment is **GRANTED in part and DENIED in part**. Plaintiff's Motion to Strike is **DENIED as moot**.

## BACKGROUND

This action arises from the death of Phillip Williams (the "Decedent") on July 3, 2014. Plaintiff alleges that Defendant committed medical malpractice due to many negligent acts or omissions that allegedly caused Decedent's death.

**Decedent's Prior Medical History**

Since at least 2010, Decedent had been receiving medical treatment at the Waycross Veterans Affairs ("VA") clinic. Dkt. No. 64 ¶ 12. Decedent was first treated at the VA by Dr. Clay Lee, a board-certified, family-practice physician. Id. Between 2010 and 2014, Dr. Lee treated Decedent for hypertension, diabetes, migraine headaches, depression, obstructive sleep apnea, back pain, neck pain, hyperlipidemia, obesity, GERD, gout, and foot pain, among other conditions. Id. ¶ 13. Decedent was also enrolled in CCHT, care coordination/home telehealth (the "Home Telehalth System"), which monitored and helped manage his blood sugar/glucose via an in-home messaging device. Id. ¶ 14.

**July 1 – July 2, 2014, Treatment at the VA**

On Tuesday, July 1, 2014, Decedent presented to the emergency room ("ER") at the Lake City VA Medical Center in Lake City, Florida. Id. ¶ 15. At the ER, Decedent complained of a migraine headache, diarrhea, nausea, vomiting, fever, a cat scratch to his right wrist, along with discomfort in his right shoulder and mild streaking up his right arm. Dkt. No. 61-2 at 16, 21.[1] Decedent described his pain level from his headache as a level 9 out of 10.

---

[1] One progress note time-stamped at 20:14 (8:14 p.m.) states that Decedent "denies any systemic complaints such as . . . vomiting, [or] diarrhea." Dkt. No. 61-2 at 21. A progress note time-stamped at 20:24 (8:24), however, states that Decedent was experiencing "nausea/vomiting," id. at 18, and "had diarrhea," id. at 16.

AO 72A
(Rev. 8/82)

Id. at 17. The ER physician, Dr. White, treated Decedent with an injection of Rocephin (an antibiotic), an injection of Zofran (an anti-nausea medication), and an injection of Dilaudid, for pain. Dkt. No. 64 ¶ 17. Decedent was discharged around 9:00 p.m. that evening. Id. ¶ 18.

At approximately 8:00 a.m. the next day, July 2, 2014, Decedent was flagged in the VA Home Telehealth System for high blood glucose. Id. ¶ 19. Decedent had an elevated blood glucose reading of 560 mg/dl. Id. ¶ 20. This prompted a Waycross VA nurse to call Decedent around 12:00 p.m.; the nurse requested that Decedent come to the Waycross VA clinic for an assessment and blood glucose check. Id.; Dkt. No. 61-2 at 12. The note from the call states that Decedent reported that he felt terrible, that he had a fever, a terrible headache, and red streaks running up his forearm from what Decedent was told was a cat scratch. Dkt. No. 61-2 at 12. About an hour-and-a-half later, the nurse again called Decedent because he had not yet arrived at the clinic. Id. at 13. The nurse noted that Decedent told her he was coming in to the clinic within the hour. Id. Upon arrival at the clinic, Decedent's blood glucose was checked, and it had decreased to 217 mg/dl. Dkt. No. 64 ¶ 23. Also while at the clinic, Decedent reported that he had not eaten that day but had drunk one Gatorade and a water. Dkt. No. 61-2 at 7. He also reported some swelling and tightness to his right arm where a cat had scratched him; his

AO 72A
(Rev. 8/82)

pain was still a level 9 and was at the base of his neck; he also reported that he had been experiencing a migraine since June 29. Id.

A nurse informed Dr. Lee of Decedent's complaints and requested that Dr. Lee examine Decedent. Dkt. No. 64 ¶ 25. Dr. Lee also reviewed Decedent's ER note from the previous night in order to understand the diagnosis and treatment provided by the ER physician. Id. ¶ 26. Dr. Lee assessed Decedent as having "Cellulitis of right arm secondary to cat scratches," a migraine headache, and a "[h]istory of back pain with recent increase in symptoms." Dkt. No. 61-2 at 4.[2] Dr. Lee prescribed a Rocephin/Ceftriaxone injection (an antibiotic for the treatment of cellulitis) and an injection of Phenergan (for nausea). Dkt. No. 64 ¶ 29. Decedent was also given a cold rag and a diet coke and placed in a dim room to rest while the pharmacy prepared the injections. Id. The injections were administered between 5:37 and 5:39 p.m. Id. ¶ 30. Additionally, Decedent was instructed to continue the Azithromycin as prescribed by the ER, continue taking pain medication for treatment of headaches, take Phenergan as needed for nausea, and to notify the VA clinic if his headache symptoms worsened. Id. ¶ 31. Prior to discharge, Decedent noted

---

[2] That progress note is dated July 3, 2014, but the note contains an addendum stating that "the note is dated 7/3/14 but but [sic] was seen late on July 2 2014 and note dictated the next afternoon." Dkt. No. 61-2 at 5.

some relief of his headache.  Id. ¶ 32.  In deciding to discharge Decedent that evening at around 5:45, Dr. Lee concluded that Decedent did not require hospitalization because (1) Decedent's blood sugar had decreased from 560 to 217 mg/dl, (2) Decedent was afebrile (not feverish), (3) meningitis had been ruled out, (4) Decedent had been given injections of antibiotics to treat cellulitis both at the ER and at the VA clinic, and (5) it had been less than 24 hours since Decedent had received the first antibiotic injection.  Dkt. No. 61-4 ¶ 10; Dkt. No. 61-3 at 27–28.

**July 3, 2014, Decedent's Death**

The following day, July 3, 2014, Decedent went to work at a local car dealership, where he worked as a salesperson.  Dkt. No. 64 ¶ 34.  The sales manager at the dealership, Jack Anderson (who is also Decedent's cousin), observed Decedent arrive at work around 9:00 a.m.  Id. ¶ 35.  Shortly after arriving, Decedent told Anderson that he was not feeling well, that his doctor had given him some medication for an infection, and that he wanted to stay in his office to work on his certifications rather than perform his normal duties.  Id. ¶ 36.  Anderson told Decedent that if he could not perform his normal duties, then he needed to go home. Id. ¶ 37.  When Decedent stood up, Anderson noticed that he was dizzy, appeared wobbly, and in no condition to drive, so Anderson offered to drive him home.  Id. ¶ 38.  Prior to leaving the

AO 72A
(Rev. 8/82)

dealership, Anderson asked Decedent if he needed to go to the hospital, but Decedent declined. Id. ¶ 40. Anderson then drove Decedent and his truck home, with another employee trailing behind. Id. On the ride home, Anderson again asked Decedent if he needed to go to the hospital, and Decedent again declined. Id. ¶ 41. Upon arrival at Decedent's house, Anderson helped Decedent to the doorsteps and told Decedent to call him if he needed anything. Id. ¶ 42. Decedent then proceeded up the stairs under his own power, while holding onto the handrail, and entered the house. Id. ¶ 43. That was the last contact Anderson had with Decedent. Id. ¶ 44.

Michael Emry, Decedent's brother, was inside the house when Decedent returned from work. Id. ¶ 45. Decedent then went to sleep for about an hour. Id. ¶ 46. After awaking and while walking around the house, Decedent slipped, fell, and hit his head on an object in the living room. Id. Emry sat with Decedent for about 45 minutes after the fall. Id. ¶ 47. After talking with Emry for 45 minutes, Decedent went back to sleep. Id. ¶ 48. Decedent woke up sometime later and told Emry that he wanted to go to his pastor's house for dinner. Id. ¶ 49. Emry convinced Decedent that this was a bad idea because Decedent "looked like he needed to be at home and in bed." Id. ¶ 50.

Emry prepared dinner for Decedent at the house and brought the meal to Decedent's room around 6:00 p.m., setting it up on a

little TV table.  Id. ¶¶ 51, 52.  Emry observed Decedent start to eat, but Decedent "was, kind of, shaking." Dkt. No. 61-6 at 31. Emry testified that it would take Decedent a second to eat, but when "finally he went to eat," Emry left the room to get Decedent some water.  Id.  Emry made a glass of ice water, and when he returned, Decedent was slumped over and was not breathing.  Id. Emry tried giving him CPR while also calling 911.  Id. at 31-32. It was about three to four minutes from the time Emry left to get the glass of ice water to when he called 911.  Id. at 32.

Records indicate that the 911 call was received at approximately 7:12 p.m. and that the ambulance arrived at Decedent's house at approximately 7:19 p.m.  Dkt. No. 64 ¶ 55. Upon arrival, the Emergency Medical Services ("EMS") team observed Decedent laying face-up on the floor, with bluish skin, not breathing, and with no pulse in his carotid artery.  Id. ¶ 56. The EMS team performed CPR and applied a cardiac monitor, which noted no electrical heart activity.  Id. ¶ 57.  The EMS team attempted to ventilate Decedent without success.  Id.  They noted that they observed "copious amounts of chewed food [ ] in throat, over trachea causing complete obstruction."  Id.  At around 7:39 p.m., the EMS team removed the foods, and Decedent was ventilated and moved to a stretcher for transport to the hospital.  Id. ¶ 58. During transport, Decedent was administered two doses of epinephrine, sodium bicarbonate, saline, and oxygen.  Id. ¶ 59.

The EMS team noted long sounds bilaterally, but Decedent remained without a heartbeat (asystole) when he arrived at the Mayo Clinic hospital at approximately 7:48 p.m.  Id. ¶ 60.  The medical team at the Mayo Clinic hospital attempted to revive Decedent, and Decedent "developed a pulse with good palpable blood pressure after defibrillation and then degenerated into PEA (pulseless electrical activity) and then systole (no heartbeat/no electrical heart activity)."  Id. ¶ 61.  Decedent died at approximately 8:19 p.m. Id. ¶ 62.

**Georgia Bureau of Investigations Autopsy**

On July 7, 2014, an autopsy was performed by the Georgia Bureau of Investigation's ("GBI") Division of Forensic Sciences. Id. ¶ 64.  An amended autopsy was entered on September 25, 2018. Id. ¶ 65.  The cause of death was determined to be "airway obstruction by food due to tramadol, bupropion, propranolol, butalbital, and acetaminophen intoxication" with the manner of death determined to be an accident.  Id.  The medical examiner who performed the autopsy, Dr. Donoghue, testified that he believed the mechanism of death to be respiratory arrest due to an obstruction of his airway.  Dkt. No. 61-12 at 64.  Dr. Donoghue also testified that (1) he did not see any sign of infection on Decedent's arms, (2) he did not see any sign of cat scratch disease/fever in Decedent, (3) he did not believe that cat scratch disease contributed to Decedent's death, (4) to a reasonable degree

of medical certainty, Decedent did not have an infection at the time of his death, and (5) if Decedent had an infection in the days before his death, the antibiotics worked. Id. at 37, 46-47, 70, 72. Nevertheless, Dr. Donoghue did not review the VA records, so he was not sure whether Decedent had an infection at the time of his death or not. Id. at 72. But Dr. Donoghue did not see any infection while performing the autopsy. Id.

**The Complaint**

The Complaint sets forth two counts that contain multiple claims of medical malpractice that allegedly caused Decedent's death. Dkt. No. 1 at ¶¶ 15-31. Count I alleges that Defendant committed the following negligent acts or omissions: (1) it failed to properly determine the effect that certain medications would have on Decedent; (2) it failed to discontinue or adjust certain medications in light of their effects on Decedent; (3) it failed to prescribe the correct quantity of medication to Decedent; and (4) it prescribed excessive dosages of medication to Decedent. Id. ¶ 21. Count II alleges that Defendant committed the following negligent acts or omissions: (1) it failed to provide Decedent with intensive medical care and to treat Decedent's condition because it failed to properly diagnose Decedent's condition; (2) it failed to admit Decedent into a hospital in light of his rapidly worsening condition; (3) it failed to properly diagnose and treat Decedent by not taking into account Decedent's medical

AO 72A
(Rev. 8/82)

history; and (4) it negligently discharged Decedent, who had an advanced infection, from its office. Id. ¶ 28.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

10

The nonmovant may satisfy this burden in two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant instead attempts to carry this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

Plaintiff seeks relief under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq. "The FTCA grants federal district courts exclusive jurisdiction over claims for damages against the United States arising from personal injury 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'" Swafford v. United States, 839 F.3d 1365, 1369 (11th Cir. 2016) (quoting 28 U.S.C. § 1346(b)(1)). "Specifically, '[t]he

11

United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances.'" Id. (alteration in original) (quoting 28 U.S.C. § 2674). The Supreme Court has "interpret[ed] these words to mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a 'private person' liable in tort." United States v. Olson, 546 U.S. 43, 44 (2005) (quoting 28 U.S.C. § 1346(b)(1)). "Congress's chief intent in drafting the FTCA was not 'to create new causes of action' but 'simply to provide redress for ordinary torts recognized by state law.'" Pate v. Oakwood Mobile Homes, Inc., 374 F.3d 1081, 1084 (11th Cir. 2004) (quoting Howell v. United States, 932 F.2d 915, 917 (11th Cir. 1991)).

Because the alleged negligent acts or omissions occurred in Georgia, Georgia law applies. "To prove a medical malpractice claim in Georgia, a plaintiff must show: (1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." Knight v. W. Paces Ferry Hosp., Inc., 585 S.E.2d 104, 105 (Ga. Ct. App. 2003) (citation omitted). As a starting point, Georgia law presumes "in medical malpractice cases that the physician performed in an ordinarily, skillful manner, so the

burden is upon the plaintiff to show a want of due care or skill." Bowling v. Foster, 562 S.E.2d 776, 779 (Ga. Ct. App. 2002) (citation omitted). To overcome this presumption, "a plaintiff is usually required to 'offer expert medical testimony to the effect that the defendant-doctor failed to exercise that degree of care and skill which would ordinarily have been employed by the medical profession generally *under the circumstances.*'" Id. (quoting Killingsworth v. Poon, 307 S.E.2d 123, 125 (Ga. Ct. App. 1983)). The required degree of skill and care that was allegedly breached usually must "be established by testimony of physicians, for it is a medical question." Killingsworth, 307 S.E.2d at 125 (citation omitted). "Additionally, there can be no recovery for medical negligence involving an injury to the patient where there is no showing to any reasonable degree of medical certainty that the injury could have been avoided." Cannon v. Jeffries, 551 S.E.2d 777, 779 (Ga. Ct. App. 2001). Indeed, "there must be a realistic assessment of the likelihood that the alleged negligence caused the injury or death." Id.

## I. Dr. Hansen's Affidavit

Attached to Plaintiff's response to Defendant's Motion for Summary Judgment is an affidavit by one of Plaintiff's experts, Dr. Hansen. See Dkt. No. 60-1. Defendant previously moved to strike this affidavit as untimely under Federal Rule of Civil Procedure 26(a). The Court denied that motion and reopened

discovery for the limited purpose of Defendant deposing Dr. Hansen. Because Defendant was given the opportunity to depose Dr. Hansen regarding his opinions set forth in his affidavit, the affidavit is not untimely and is properly considered at this stage.

Nevertheless, Defendant has since challenged Dr. Hansen's opinions in the affidavit under Federal Rule of Evidence 702, also known as a <u>Daubert</u> challenge. The challenge is **DENIED** at this time. Defendant is permitted to reurge such challenge prior to trial, but such challenge shall be limited to the opinions by Dr. Hansen that are set forth in his affidavit, dkt. no. 60-1. Defendant is also **GRANTED** one more opportunity to depose Dr. Hansen on the limited topic of Dr. Hansen's opinions that are set forth in his affidavit. Plaintiff's Motion to Strike is **DENIED** as moot.

## II. Claims Relating to Decedent's Medications (Count I)

Count I of the Complaint alleges four acts or omissions that Plaintiff claims were negligent and proximately caused Decedent's death. The negligent acts or omissions that Defendant allegedly committed are: (1) it failed to properly determine the effect that certain medications would have on Decedent; (2) it failed to discontinue or adjust certain medications in light of their effects on Decedent; (3) it failed to properly prescribe the correct quantity of medications for Decedent; and (4) it prescribed excessive dosages of medications to Decedent.

Defendant argues that "Plaintiff has failed to present expert testimony on the first two elements required to sustain a medical malpractice action." Dkt. No. 61 at 13. Defendant points out that Plaintiff has offered three experts: Dr. Wright, Dr. Hansen, and Dr. Hilliard. Dr. Wright, Defendant argues, did not opine on the standard of care or on whether the standard of care was breached. Likewise, Defendant argues that Dr. Hansen did not opine on the standard of care for prescribing or administering medications or on whether the standard of care for prescribing or administering medicine was breached. Finally, Defendant argues that Dr. Hilliard suffers from the same fatal omissions because he only opined on the cause of death. Based on this record, Plaintiff is unable to establish the standard of care with respect to the negligent acts or omissions alleged in Count I.

In Georgia medical malpractice cases, "it is usually required that the patient offer expert medical testimony to the effect that the defendant-doctor failed to exercise that degree of care and skill which would ordinarily have been employed by the medical profession generally under the circumstances." Killingsworth, 307 S.E.2d at 125. In order to determine whether Defendant exercised the degree of care and skill ordinarily employed by the medical profession, the Court or jury must know what that degree of care and skill is. Lay opinions and Plaintiff's own statements are not enough. See Suggs v. United States, 199 F. App'x 804, 808 (11th

Cir. 2006) ("A plaintiff may not rely on his own statements and lay opinions to avoid summary judgment."). Rather, the complex question of the standards of care for administering and prescribing medications must be established by "expert medical testimony." 307 S.E.2d at 125. Plaintiff has failed to provide sufficient expert testimony.

Plaintiff argues that Paragraph 16 of the Complaint, which Defendant admitted to in its Answer, establishes the standard of care for the alleged acts or omissions set forth in Count I. Paragraph 16 of the Complaint states that Defendant "had a continuing duty to properly treat [Decedent] within the prevailing standard of care for physicians and to monitor any and all medications being taken by [Decedent] to ensure that they did not have a deleterious effect on [Decedent's] health, and to refer [Decedent] to other physicians or specialists or hospitals as appropriate." Dkt. No. 1 ¶ 16. Defendant's admission of this Paragraph is not sufficient to establish the standard of care for any of the allegedly negligent acts or omissions set forth in Count I.

Defendant's recognition—that a doctor has a duty to monitor medications to ensure that they did not hurt Decedent's health—does not establish the degree of care required in exercising that duty. For example, the first allegedly negligent act or omission Plaintiff sets forth in Count I is that Defendant failed "to

properly follow [Decedent] to determine the effect the medication(s) was having on him." Id. ¶ 19. Plaintiff, however, does not show where in the record it is established what properly following Decedent or properly determining the effects of medications on Decedent requires—i.e., what are "the parameters of acceptable professional conduct, a significant deviation from which would constitute malpractice," Self v. Exec. Comm. of Ga. Baptist Convention, 266 S.E.2d 168, 169 (Ga. 1980) (citation omitted), for properly following Decedent or determining the effects of medications on Decedent.

This same issue plagues the remaining three averred negligent acts or omissions set forth in Count I. Regarding the second alleged act or omission—that Defendant "fail[ed] to discontinue or adjust the medication(s) in light of its effects on [Decedent], id.—once again, the record does not establish "that degree of care and skill which would ordinarily have been employed by the medical profession generally," 307 S.E.2d at 125, when determining whether to discontinue or adjust medications in light of their effects on Decedent. Such decisions involve complex questions and expert knowledge of chemistry, pharmacology, and more broadly, medicine—three fields that are outside the knowledge and experience of lay people. Thus, the fact that Defendant admitted to having a duty "to monitor any and all medications being taken by [Decedent] to ensure that they did not have a deleterious effect on [Decedent's]

AO 72A
(Rev. 8/82)

health," dkt. no. 1 ¶ 16, does not establish "the parameters of acceptable professional conduct," 266 S.E.2d at 169, that Defendant should have employed when determining "the correct quantity of medication for [Decedent]," or if Decedent was prescribed "excessive dosages of medication." Dkt. No. 1 ¶ 19.

For these reasons, Plaintiff cannot overcome the presumption "that the physician performed in an ordinarily, skillful manner." 562 S.E.2d at 779 (citation omitted). Accordingly, Defendant's Motion for Summary Judgment with respect to the claims in Count I is due to be **GRANTED**.

## III. Claims Relating to Decedent's Discharge from the Waycross VA (Count II)

Count II of the Complaint also sets forth four negligent acts or omissions that Plaintiff avers were the proximate cause of Decedent's death. The negligent acts or omissions that Defendant allegedly committed were: (1) it failed to provide Decedent with intensive medical care because it failed to properly diagnose and treat Decedent's condition; (2) it failed to admit Decedent into a hospital in light of his rapidly worsening condition; (3) it failed to properly diagnose and treat Decedent by not taking into account Decedent's medical history; and (4) it negligently discharged Decedent, who had an advanced infection, from its office. Defendant argues that these claims must fail for lack of record evidence that any one of the four breaches was the proximate cause of Decedent's death. Specifically, Defendant argues that

AO 72A
(Rev. 8/82)

"Plaintiff has failed to present expert testimony to create a triable issue of fact as to whether [Decedent's] death was caused by a failure to refer or admit him to the hospital on July 2, 2014, for treatment of an infection." Dkt. No. 68 at 9.

Plaintiff responds that causation is sufficiently established by Dr. Hansen's expert opinions. In his expert witness report, Dr. Hansen opined that Dr. Lee "negligently failed to properly assess [Decedent's] extremely elevated blood sugar on his presentations and when considered with his other conditions, including a rapidly spreading infection accompanied by a headache and fever, Dr. Lee should have either instructed [Decedent] to proceed to the nearest hospital for admission or admitted [Decedent] to the hospital immediately for management of his care including the infection and significant hyperglycemia." Dkt. No. 37 at 1-2. Regarding this opinion, Dr. Hansen testified that "given [Decedent's] infection and what it does to your blood sugars, as well as causing dehydration and electrolyte disorders, he needed to be managed more closely." Dkt. No. 70-2 at 72-73.

Dr. Hansen also opined in his expert report that if Dr. Lee had "non-negligently conducted a clinical evaluation with the patient," then "this would have allowed for properly qualifying the risks and management of the patient's medical problems and for ultimately instructing and directly and [sic] facilitating the prompt admission of the patient to the hospital where treatment of

AO 72A
(Rev. 8/82)

significant hyperglycemia and dehydration and management of infection could have been performed." Dkt. No. 37 at 2. When asked to elaborate on this opinion at his deposition, Dr. Hansen stated that Dr. Lee failed to treat Decedent's cellulitis that was "worsening, in the context of a diabetic with spikes of hyperglycemia, poor PO intake, . . . and his blood sugars would be strongly suggestive of dehydration, and that that compilation of factors should have led to at least an evaluation in the emergency trauma center of the hospital and/or admission." Dkt. No. 70-2 at 83.

Dr. Hansen further opined in his expert witness report that "Dr. Lee failed to admit or instruct Phillip Williams to go to the hospital and negligently failed to properly refer Phillip Williams to a hospital setting with all the necessary safeguards." Dkt. No. 37 at 2. Elaborating on this opinion at his deposition, Dr. Hansen opined that "with the cellulitis, which was worsening, the diabetes, which was worsening, and presumed dehydration, the treatments that would be available in the hospital, that are not available in the home setting, would have led to a better outcome." Dkt. No. 70-2 at 84-85. Dr. Hansen testified that his "opinion as to the cause of [Decedent's] confusion, mental status change, incoordination, [and] difficulty walking, . . . was a combination, most likely, of many things, including his medication, his infection, his diabetes, and probably dehydration as well." Id.

AO 72A
(Rev. 8/82)

at 86. Finally, Dr. Hansen opined in his affidavit that "the failure to adequately treat [Decedent's] cellulitis and severe hyperglycemia contributed to [Decedent's] worsening lethargy and confusion and caused the choking episode" and that Dr. Lee was negligent in failing to admit Decedent to a hospital for management of the infection and significant hyperglycemia which caused Decedent "to become lethargic and confused and caused the choking episode." Dkt. No. 65-1 ¶ 12.[3]

Defendant only challenges the proximate causation element of Plaintiff's claims averred in Count II. Thus, for purposes of this Motion, Defendant has conceded that Plaintiff has established a duty and the standard of care and that the standard of care was breached by each of the four allegedly negligent acts or omissions of Defendant as averred in Count II.

Regarding proximate causation in a Georgia medical malpractice case:

> "[A] plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence

---

[3] Defendant argued at the summary judgment hearing that Dr. Hansen is not qualified to testify as to the cause of Decedent's death "because he cannot use his routine clinical approach with live patients on the dead patient in this case." Clarke v. Schofield, 632 F. Supp. 2d 1350, 1358 (M.D. Ga. 2009). This case is not like Clarke where the expert needed to rely on other experts to determine the location and existence of a deep venous thrombosis ("DVT"), the location and existence of which was a key issue in that case. Id. at 1359. In other words, the expert in Clarke was not an expert regarding the issue he was testifying about. Here, Dr. Hansen opined that the failure to treat certain conditions contributed to Decedent's confusion and lethargy. Defendant has not shown why Dr. Hansen, who is board certified in Family Medicine, is not qualified to make opinions regarding certain consequences of failing to treat cellulitis and significant hyperglycemia.

AO 72A
(Rev. 8/82)

that the negligence either proximately caused or contributed to cause plaintiff harm." <u>Zwiren v. Thompson</u>, 276 Ga. 498, 500, 578 S.E.2d 862 (2003) (citations and punctuation omitted). To meet this burden, a medical malpractice plaintiff must present expert testimony "because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." <u>Id.</u> Ultimately, the causation evidence must rise above mere chance, possibility, or speculation.

<u>Edokpolor v. Grady Mem'l Hosp. Corp.</u>, 819 S.E.2d 92, 94 (Ga. Ct. App. 2018). Stated differently, "there can be no recovery for medical negligence involving an injury to the patient where there is no showing to any reasonable degree of medical certainty or probability that the injury could have been avoided." <u>Allen v. Family Med. Ctr., P.C.</u>, 652 S.E.2d 173, 176 (Ga. Ct. App. 2007)

Dr. Hansen's opinions and testimony are sufficient to show to a "reasonable degree of medical certainty or probability that the injury could have been avoided." <u>Allen</u>, 652 S.E.2d at 176. To begin, the Court accepts for the purposes of this Motion that Defendant negligently failed to properly diagnose and treat Decedent's conditions and symptoms of cat scratch, arm swelling, elevated blood sugar, infection, headache, and hypertension with intensive medical care, and that Defendant negligently failed to admit Decedent to a hospital in light of his rapidly worsening condition.

Plaintiff has provided expert testimony that shows to a reasonable degree of medical certainty or probability that

AO 72A
(Rev. 8/82)

admitting Decedent to a hospital on July 2, 2014, would have avoided Decedent's death the evening of July 3, 2014. Dr. Hansen testified that Decedent "needed to be managed more closely," dkt. no. 70-2 at 73, that he should have had "at least an evaluation in the emergency trauma center of the hospital and/or admission," id. at 83, and that "treatments that would be available in the hospital, that are not available in the home setting, would have led to a better outcome," id. at 84-85. Dr. Hansen also opined in his affidavit that Defendant's "failure to adequately treat [Decedent's] cellulitis and severe hyperglycemia *contributed to* [Decedent's] worsening lethargy and confusion and *caused* the choking episode." Dkt. No. 65-1 ¶ 12 (emphases added). Finally, Dr. Hansen opined that Defendant's failure to admit Decedent to a hospital to manage his infection and significant hyperglycemia also caused Decedent's lethargy and confusion. Considering this testimony, then, a reasonable jury could find that Plaintiff has established that if Decedent had been admitted to the hospital and treated there, then such actions "would have led to a better outcome," dkt. no. 70-2 at 73, because Decedent would not have been as confused and lethargic at the time he choked.

Finally, this case is sufficiently similar to Allen to survive summary judgment on the issue of proximate causation. There, the Georgia Court of Appeals overturned the trial court's granting of summary judgment and found that a plaintiff established a jury

AO 72A
(Rev. 8/82)

issue on proximate causation by means of his expert's testimony that the injury "could have been avoided." <u>Allen v. Family Med. Ctr., P.C.</u>, 652 S.E.2d 173, 176 (Ga. Ct. App. 2007). That court reasoned that the expert explained "with specificity the precautions that should have been taken by the employee administering the shot and states that the failure to take these precautions proximately caused Allen's injury." <u>Id.</u> Here, Dr. Hansen explained with specificity the reasons that Decedent should have been admitted to the hospital, that Decedent would have faced a better outcome if he had been so admitted, and that Decedent would not have been as confused and lethargic if he had been properly treated. Accordingly, a reasonable jury could find that at least one of the alleged negligent acts or omissions set forth in Count II were the proximate cause of Decedent's death.

For these reasons, then, Defendant's Motion for Summary Judgment with respect to Count II is due to be **DENIED**.

**CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment, dkt. no. 61, is **GRANTED in part and DENIED in part**. Defendant's Motion is **GRANTED** with respect to Count I. Defendant's Motion is **DENIED** with respect to Count II. Defendant's <u>Daubert</u> challenge is **DENIED**, but Defendant may reurge it before trial. Defendant is **GRANTED** the opportunity to depose Dr. Hansen on the

AO 72A
(Rev. 8/82)

limited topic of Dr. Hansen's opinions set forth in his affidavit. Plaintiff's Motion to Strike, dkt. no. 78, is **DENIED as moot**.


**SO ORDERED**, this 13th day of August, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)